**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| MELISSA BLODY, | ) | CASE NO. 3:24-CV-1089 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION** |
| SECURITY, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

## I.      INTRODUCTION

The Commissioner of Social Security[1] denied Plaintiff Melissa Blody's application for Disability Insurance Benefits (DIB). Ms. Blody seeks judicial review of that decision pursuant to 42 U.S.C. § 405(g). (Compl., ECF No. 1.) The parties have consented to a magistrate judge exercising jurisdiction over the case pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure, and Local Rule 73.1. (ECF No. 6.)

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision denying Ms. Blody's application for benefits.

## II.      PROCEDURAL HISTORY

### A.      Prior Application for Benefits

Ms. Blody previously filed an application for DIB in August 2019. (Tr. 349.) An administrative law judge (ALJ) issued a decision denying her application on January 6, 2021. (Tr. 346–68.) In finding that Ms. Blody was not disabled, the ALJ concluded that she had severe

---

[1] Martin O'Malley resigned as Commissioner of Social Security in November 2024. Carolyn W. Colvin served as Acting Commissioner of Social Security from November 2024 to January 2025. Michelle A. King thereafter served as Acting Commissioner until February 2025. Leland C. Dudek is currently serving as Acting Commissioner.

conditions of obesity, depression, migraines, generalized anxiety disorder, and idiopathic cranial hypertension. (Tr. 352.) But the ALJ found that she had the residual functional capacity to perform sedentary work with certain additional limitations. (Tr. 355.) The SSA Appeals Council denied review in April 2021 (Tr. 369), and Ms. Blody did not file an action in this Court for judicial review.

### B. Current Application for Benefits

On May 21, 2021, Ms. Blody filed the current application to the agency, seeking DIB. (Tr. 646, 668–70.) She claimed that she became disabled on January 7, 2021. (Tr. 646.) She identified seventeen disabling conditions: (1) idiopathic intracranial hypertension, (2) pseudotumor, (3) memory loss, (4) balance problems, (5) gait problems, (6) optic pressure, (7) chronic fatigue, (8) myoclonus "jerks," (9) rapid heart rate, (10) Reynaud's syndrome, (11) temporal pressure, (12) fibromyalgia, (13) irritable bowel syndrome, (14) depression, (15) anxiety, (16) "optical migraines," and (17) chronic sinusitis. (Tr. 672.)

Ms. Blody's application was denied at the initial administrative-review level (Tr. 378, 452) and again upon reconsideration (Tr. 389, 463.)

Ms. Blody then requested a hearing with an ALJ. (Tr. 472.) She submitted a brief in advance of the hearing. (Tr. 732–34.)

The ALJ held a hearing on May 13, 2022. (Tr. 326–45.) Ms. Blody testified and was represented by counsel at the hearing. (*See id.*)

The ALJ issued a decision on June 1, 2022, finding that Ms. Blody was not disabled. (Tr. 409–31.) Ms. Blody asked the SSA Appeals Council to review that decision. (Tr. 538–40.)

In March 2023, the Appeals Council vacated the ALJ's decision and remanded the case back to the ALJ. (Tr. 439–42.) The Appeals Council required the ALJ to consider additional

medical evidence submitted after the ALJ's initial decision, specifically brain-mapping results that the Council interpreted as suggesting additional mental-functional limitations with respect to Ms. Brody's ability to use judgment to make simple work-related decisions and her ability to handle occasional changes in a routine work setting. (Tr. 441.)

The ALJ held a second hearing on August 21, 2023. (Tr. 295–325.) Ms. Blody was again represented by counsel, who again filed a pre-hearing brief on her behalf. (*See id.*, Tr. 764–70.) Ms. Blody testified, as did a medical expert and a vocational expert. (*See id.*)

The ALJ issued a second decision on September 7, 2023, finding that Ms. Blody was not disabled. (Tr. 219–52.)

Ms. Blody requested that the SSA Appeals Council review the ALJ's decision, arguing that the ALJ did not adequately evaluate the brain-mapping records and "should have found that [her] migraines preclude all work." (Tr. 642–44.)

On May 31, 2024, the Appeals Council denied Ms. Blody's request to review the ALJ's decision. (Tr. 1–6.)

Ms. Blody filed her complaint seeking judicial review of that decision on June 27, 2024. (Compl., ECF No. 1.) She raises the following assignment of error:

> The ALJ erred in rendering a residual functional capacity that lacked the support of substantial evidence because it did not reflect Ms. Blody's statements related to symptoms and limitations arising from her severe migraine impairment.

(Pl.'s Merit Br., ECF No. 8, PageID# 2028.)

## III.    FACTUAL BACKGROUND

### 1.    Personal, Educational, and Vocational Experience

Ms. Blody was born in 1978 and was 42 years old on the date of her application. (Tr. 239, 646.) She graduated high school. (Tr. 239, 330, 673.) She previously worked as a home-health

3

aide. (Tr. 673–74, 718, 761.) She lives with her husband. (Tr. 329.) She holds a driver's license and has no trouble driving. (Tr. 330.)

### 2. <u>Function Reports</u>

The record contains a handwritten letter from Ms. Blody's husband—Michael Blody—in support of her application for benefits. (Tr. 680–81.) Mr. Blody described that Ms. Blody has "episodes" in which she experiences "severe head pressure" with headaches and other symptoms. (Tr. 680.) Mr. Blody has to take care of Ms. Blody during these times, which is difficult because of his own health conditions. (*Id.*)

Ms. Blody reported to SSA staff that two of her doctors—Dr. Ken Murray and Dr. Howard Smith—advised her that she would not be able to work due to her physical and mental conditions. (Tr. 720.) She wrote that another doctor—Dr. Sarel Vorster—told her in December 2022 that she may be a candidate for a stent to correct a "squished" vein. (Tr. 758.)

### 3. <u>Relevant Hearing Testimony</u>

#### a.   *Ms. Blody's Testimony*

Ms. Blody testified that her body is "really stiff and sore all the time." (Tr. 330.) She has stiffness in her neck, she uses a cane, and she finds that she has "to move constantly." (*Id.*) She wears a transcutaneous-electrical-nerve-stimulation device ("TENS unit") once or twice a day for up to an hour at a time. (Tr. 338.)

She said she has excess fluid around her brain and her vision is "kind of blurry." (Tr. 330.) She suffers from daily headaches; she takes daily medication to manage the headaches and has another prescription for migraines. (Tr. 335.) She estimated that she takes ten to twelve of those migraine pills per month (up to two pills per day if the migraine is severe). (Tr. 336.) When she is

4

having a migraine, she has to lay down in bed in complete darkness; she is sensitive to light and sound. (*Id.*) She has one or two of those severe migraine headaches per week. (*Id.*)

She is tired "all the time," which she attributed to depression. (Tr. 330.) Her depression causes her to feel "really sad" and, sometimes, feel that "life isn't real." (Tr. 337.)

She has Raynaud's syndrome, which causes her feet and fingers to turn "white and feel cold and wet." (Tr. 330.) She gets hand tremors and limits herself to lifting items weighing less than ten pounds. (Tr. 332.)

She also has been diagnosed with fibromyalgia and idiopathic intracranial hypertension. (Tr. 330.) She has "brain fog[]" and finds that she has trouble concentrating and completing tasks. (Tr. 337.)

Ms. Blody estimated that she cannot walk a full city block; she walks "hunched over" and finds herself "pretty sore" even after walking to her vehicle. (Tr. 331.) Her ability to walk has diminished over the past year. (*Id.*) She further estimated that she can stand in one place for only two minutes at a time. (*Id.*) She cannot bend at the waist; she has to squat instead. (Tr. 332.) She described that, when she bends over, "the pressure just rushes forward and it's like your head is like the alien character where half of his head is outside." (Tr. 335.) She can sit in one place for ten minutes at a time, after which she has to reposition herself or stand up. (Tr. 332.)

She sleeps on average five hours a night and naps for about two hours during the day; she finds that she is "[u]p and down in the bed." (Tr. 333.) She requires help getting into and out of the shower and uses a shower chair. (*Id.*) She is able to cook simple meals using the microwave or a crockpot. (*Id.*) She is not able to scrub the floors because she cannot "put [her] head down," and she cannot do any chores that would require her to get down on her knees. (Tr. 334.) She is able to do laundry, except she has trouble reaching clothes in the back of the dryer. (Tr. 333–34.) She

5

is able to do other chores for a few minutes at a time. (Tr. 333.) She orders groceries online and picks them up; her husband helps her put the groceries away. (Tr. 338.)

Ms. Blody does canvas painting and attends weekly virtual church services. (Tr. 334.)

At the second hearing, Ms. Blody testified that she had been having at least four "migraine days" per week. (Tr. 299.) Her migraines are "debilitating," turning her everyday "dull aching" headache pain into "stabbing pain." (*Id.*) Once a week, she has a migraine severe enough to cause her to vomit. (Tr. 300.)

After the first hearing, Ms. Blody was started on a new medication—Naltrexone—for her fibromyalgia. (Tr. 301.) The medication has been "slightly" helpful, but she continued to experience daily flu-like achiness and tiredness. (*Id.*)

Ms. Blody testified that she has bilateral carpal tunnel syndrome, for which she takes medication and uses a brace on her right wrist. (Tr. 302.)

She gets numbness and tingling in her heels and her toes. (Tr. 303.) Her head hurts when she walks. (*Id.*) She uses a sleep-apnea machine. (*Id.*)

She takes medication for depression and seeks a counselor weekly. (Tr. 304.)

She likes to paint and listen to soft music. (*Id.*)

She has been having trouble concentrating; she can no longer do mathematics in her head and forgets what day it is. (Tr. 305.)

She spends most of her day sitting outside in a chair, looking at flowers. (Tr. 306.) She does not drive very often. (*Id.*) She sees "spots" every once in a while because of her cranial hypertension. (Tr. 307.)

Six months ago she was started on a new medication for her Raynaud's syndrome; the medication is helping. (Tr. 308.)

She has experienced seizure activity, which has manifested as "zoning out"; the last time was four months before the hearing. (Tr. 308.)

### b.    Vocational Experts' Testimony

Mary Everts testified as a vocational expert at the first hearing. (Tr. 339.)

The ALJ asked the expert to imagine a hypothetical person with Ms. Blody's age, education, and work experience who has the residual functional capacity to perform work at the sedentary exertional level with the following additional limitations: the person cannot climb ladders, ropes, or scaffolds but can frequently climb ramps and stairs; the person must avoid all exposure to moving mechanical parts and "high exposed places"; the person can understand, remember, and carry out simple or detailed instructions, but not complex instructions, in performing work that does not require a specific production rate or an hourly quota;[2] the person is capable of using judgment to make simple work-related decisions with occasional changes in a routine work setting; and the person may have occasional interaction with the general public, coworkers, and supervisors. (Tr. 339–40.)

The expert opined that such a person could perform work that exists in the national economy, such as that required of a "document preparer" (DOT 249.587-018), "sorter" (DOT 521.687-086), "inspector" (DOT 669.687-014), or "surveillance system monitor" (DOT 379.367-010).

---

[2] The ALJ misspoke when laying out this hypothetical question; he asked the expert to consider that the hypothetical person would perform work that "requires a specific production rate." (*See* Tr. 340.) The context of the question and response makes clear that the ALJ was asking the expert to consider work that did not require a specific production rate, not least of all because the ALJ also limited the individual to work without an hourly quota. (*See id.*) Moreover, the ALJ repeated this hypothetical at the second hearing, wherein he asked the expert to consider that the person would not be performing work at a specific production rate. (*See* Tr. 320.)

The expert opined that the hypothetical person could perform these jobs, even if the person also used a cane for ambulation and must be able to sit or stand, alternating positions in the area of the workstation for up to two minutes every half hour, if the person could remain on-task for at least 90 percent of the workday. (Tr. 341.)

Finally, the ALJ asked the expert to add an additional limitation, that the person would also be off-task for more than 15 percent of the workday. (*Id.*) The expert opined that there would be no jobs available in the national economy for such a person. (*Id.*) The expert testified that being off-task for 15 percent or more of the workday is work-preclusive. (Tr. 342.) Similarly, employers normally allow no more than one absence each month; any more absences on an ongoing basis would be work-preclusive. (*Id.*)

Ms. Blody's counsel asked the expert to imagine that the hypothetical person would not be able to bend at the waist, even enough to sit down or stand up. (Tr. 343.) The expert opined that there would be no jobs available to someone so limited. (*Id.*) But the expert testified that all the jobs she previously identified would remain available to someone who needed to sit for nearly the entire day, with only an occasional need to get up and move around. (*Id.*)

Ms. Blody's counsel next asked the expert to imagine that the hypothetical person from the ALJ's first hypothetical question could only occasionally perform gross manipulations and rarely perform fine manipulations. (*Id.*) The expert opined that there would be no jobs available for someone so limited. (Tr. 344.)

Finally, the expert opined that employers would not typically allow an employee to take additional 45-minute breaks twice a day, beyond normal breaks; such an allowance would be a "significant accommodation." (*Id.*) If the hypothetical person needed those significant additional breaks, there would be no jobs available to them. (*Id.*)

8

Julie Dyer testified as a vocational expert at the second hearing. (Tr. 319.)

The ALJ repeated his first hypothetical question from the first hearing, namely asking the expert to consider that the person could perform sedentary work with certain additional limitations. (Tr. 320.) The expert opined that such a person could perform work that exists in the national economy, such as that required of a "touch-up screener" (DOT 726.684-110), "assembler" (DOT 739.687-066), or "inspector" (DOT 669.687-014). (Tr. 321.)

The ALJ then repeated his second hypothetical from the first hearing, wherein the hypothetical person uses a cane and requires a "sit/stand option." (*Id.*) The expert opined that all three identified jobs would remain for such a person, although there would be 50 percent fewer job openings "to allow for employer tolerances." (*Id.*)

The ALJ then asked the expert to imagine that the hypothetical person would be off-task for more than ten percent of the workday. (Tr. 322.) The expert opined that this additional limitation was work-preclusive; additionally, most employers will tolerate one absence a month. (*Id.*) Six absences in a year would "be excessive and likely not tolerated." (Tr. 323.) Employees are also not permitted to take unscheduled breaks in unskilled competitive employment. (Tr. 324.)

In response to questions from Ms. Blody's counsel, the expert opined that no competitive work would be available to a hypothetical person who "would not be capable of using judgment" and who could have no changes in their work setting. (Tr. 323.)

### c.  *Medical Expert's Testimony*

Psychologist David Patterson, Ph.D., testified as a medical expert at the second hearing. (Tr. 309; *see also* Tr. 1951 (resume)). Dr. Patterson reviewed the medical records in the file and opined that Ms. Blody has a history of unspecified depressive disorder and unspecified anxiety disorder. (Tr. 310–11.) He further opined that those conditions would be considered non-severe

9

under the Social Security Administration's standards and would not meet or medically equal any of the relevant listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 312.)

Dr. Patterson opined on several functional limitations stemming from Ms. Blody's mental impairments. (Tr. 312–15.)

Dr. Patterson was not able to significantly opine upon the brain-mapping data, as he was not familiar with the particular tests performed; he said that a neurologist would better be able to "translate" the data into any functional limitations. (*See generally* Tr. 316–18.)

### 4. State Agency Medical Consultants

A disability examiner (Adelle Kenney), a physician (Steve McKee, M.D.), and a psychologist (Irma Johnston, Psy.D.) reviewed Ms. Blody's claim at the initial administrative level. (Tr. 378–88.) Drs. McKee and Johnston adopted the residual functional capacity from the ALJ's January 2021 decision denying Ms. Blody's previous application for benefits; they found that "there is no new & material evidence," "her anxiety & depression remain as seen by the ALJ," and that the RFC applied even though Ms. Blody no longer had an impairment of obesity. (Tr. 384–87.) Dr. McKee opined that Ms. Blody could stand or walk for two hours in a normal workday and could sit for about six hours. (Tr. 384.)

Based on these opinions, the agency concluded that Ms. Blody had the residual functional capacity to perform certain sedentary work, such as that required of a "document preparer" (DOT 249.587-018) or "sorter" (DOT 521.687-086). (Tr. 388.)

Therefore, the consultants concluded that Ms. Blody was not disabled. (*Id.*) In a letter explaining this decision, the SSA wrote that Ms. Blody's conditions limit her ability to move around regularly but "you would be able to do work where you would remain seated." (Tr. 455.) Moreover, while she had some limitations in her ability to focus and interact with others, "you are

able to understand and carry out simple tasks, interact appropriately with others when needed, tolerate the pressure of routine tasks, and care for your basic needs." (*Id.*)

In November 2021, in appealing that decision, Ms. Blody wrote that her conditions continue to worsen. (Tr. 685.) She described needing to sit down in the shower and said she found herself using a cane more often when she is moving around. (*Id.*; *see also* Tr. 689.) She wrote that she was experiencing more pain and fatigue throughout the day. (Tr. 685.) She identified that she had been diagnosed with "possible POTS" (postural orthostatic tachycardia syndrome) and venous stenosis. (*Id.*)

At the reconsideration level, a disability examiner (Danielle Yenni), a physician (W. Scott Bolz, M.D.), and a psychologist (Jennifer Whatley, Ph.D.) affirmed the finding that Ms. Blody is not disabled. (Tr. 389.) Drs. Bolz and Whatley concluded that the findings from the initial level were consistent and supported by the documentation in the record, including the additional information provided at the reconsideration level. (Tr. 396–97.)

### 5.  **Relevant Medical Evidence**

On December 16, 2019, Ms. Blody underwent a lumbar puncture in reference to a complaint of headaches occurring over five months, accompanied by blurred vision. (Tr. 777.)

Ms. Blody consulted with Dr. Jonathan Zahler on February 24, 2020, for an eye examination. (Tr. 873.) Dr. Zahler discussed with Ms. Blody how intracranial hypertension is related to vision; he recommended that Ms. Blody continue with her planned weight-loss surgery, which he said will help with the condition, and asked her to follow up in three months. (*Id.*) Ms. Blody reported that her vision complaints were improved with a diuretic medication (Diamox/acetazolamide). (*Id.*)

11

A sleep study in June 2020 confirmed that Ms. Blody suffered from severe obstructive sleep apnea. (Tr. 814.)

At a primary-care appointment on June 25, 2020, Ms. Blody denied dizziness, joint stiffness, painful joints, headaches, tingling, numbness, and weakness, although the Court notes that the nature of the appointment was to order a sleep study ahead of a surgical procedure. (Tr. 802–04.) The physical examination, conducted by a physician assistant, was normal. (Tr. 804.)

A follow-up sleep study in July 2020 noted that use of a continuous positive airway pressure (CPAP) device significantly reduced respiratory events during sleep. (Tr. 821.)

At a follow-up telehealth appointment with the sleep clinic on August 21, 2020, Ms. Blody reported that her energy level significantly improved after using the CPAP device. (Tr. 822.) She denied headache, dizziness, numbness, and weakness. (*Id.*)

Ms. Blody consulted with Dr. Adam Kapler on October 26, 2020. (Tr. 854.) Ms. Blody reported that her headaches were unchanged since her last appointment, and she said she had one instance where the room appeared to be spinning severely. (*Id.*) Dr. Kapler noted that magnetic-resonance imaging in September 2019 showed a "nearly empty sella" but was otherwise unremarkable, except for minimal degenerative and white-matter changes. (*Id.*) In a physical examination, Dr. Kapler made largely normal findings but indicated possible exophthalmos. (*Id.* ("Exophthalmos?")). The doctor decreased the dosage of her Diamox, noting that the medication was helping with Ms. Blody's "vague" vision complaints but could be contributing to "cognitive symptoms." (Tr. 855.) He gave her a migraine-medication injection (Ajovy/fremanezumab) and made certain other medication changes. (*Id.*)

Ms. Blody consulted with Dr. Kapler on December 7, 2020. (Tr. 852.) She complained that she did not find any reduction in headaches from her current medication and felt "miserable." (*Id.*

12

(spelling error corrected)). Dr. Kapler increased the dosage of one of her medications, made other medication changes, and referred her for physical therapy to correct a gait imbalance. (*Id.*) Dr. Kapler continued to assess that Ms. Blody had "mild" idiopathic intracranial hypertension, likely with concurrent migraines without aura causing daily headaches. (*Id.*)

Ms. Blody began physical therapy for imbalance and gait instability in December 2020. (Tr. 826.) While Ms. Blody reported that she could not bend over and that cardio exercises made her blood pressure increase, when the physical therapist checked in with Dr. Kapler, Dr. Kapler noted that Ms. Blody had no medical restrictions for exercise. (*Id.*) The physical therapist noted that Ms. Blody had a "mild tremor" in her hands. (Tr. 827.) She was diagnosed with a chronic, moderate abnormality of gait. (Tr. 832.)

By January 2021, Ms. Blody was "making good gains" in her balance with physical therapy. (Tr. 834.) She did report "usual" "6/10 pain" in her neck, head, and temples at her appointments that month. (Tr. 896, 905, 914.) On February 4, 2021, the physical therapist noted "excellent progress" and improvement in Ms. Blody's gait and strength. (Tr. 837.) Ms. Blody met all of her rehabilitation goals. (*Id.*)

At a neurological appointment with physician assistant Chloe Callison on January 18, 2021, Ms. Blody reported that her headaches and head pressure had been "slightly lessened" with the new medication but continued to be "bothersome." (Tr. 849.) She continued to report stiffness in her neck, back of the head, and over the temples. (*Id.*) Ms. Callison made some medication changes. (Tr. 849–50.)

At a primary-care appointment on February 8, 2021, Ms. Blody complained of sinus pressure, facial and ear pain, and a sore throat. (Tr. 806.) Ms. Blody was using a cane to walk because she "sways" when walking sometimes, especially when experiencing head pressure. (*Id.*)

The physical examination was normal. (Tr. 807.) She was prescribed an antibiotic for acute non-recurrent maxillary sinusitis. (Tr. 808.)

Ms. Blody consulted with Dr. Kapler on March 8, 2021. (Tr. 1424.) She complained of continued, daily head pressure over the temples and across the back of her head. (*Id.*) Dr. Kapler made a medication change. (Tr. 1425.)

On March 19, 2021, Ms. Blody followed up with her cardiology team after undergoing gastric bypass surgery. (Tr. 780.) Ms. Blody reported that she "has been generally doing well" since the previous appointment. (*Id.*) Ms. Blody's stress test and echocardiogram were "essentially normal." A physical examination was also normal. (Tr. 781–82.) Ms. Blody was encouraged to engage in regular exercise. (Tr. 782.)

On March 26, 2021, Ms. Blody followed up with her primary-care practice in a virtual appointment, complaining of continuing sinus issues. (Tr. 810.) She was started on a new medication and referred to an otolaryngologist. (Tr. 811.)

Computed-tomography (CT) imaging in May 2021 revealed a small polyp or cyst in Ms. Blody's maxillary sinus, as well as mild mucosal thickening and concha bullosa formation. (Tr. 845.) The scan was otherwise normal. (*Id.*) She was diagnosed with chronic maxillary sinusitis and concha bullosa. (Tr. 979.) In June 2021, she underwent sinus surgery to address these conditions. (Tr. 982–83.)

Ms. Blody consulted with Dr. Kapler on May 12, 2021. (Tr. 1422.) She reported that her head pressure was "doing better" but her headaches remained the same. (*Id.*) She described feeling pressure over her temples, such that she can "physically feel her veins swell up there." (*Id.*)

Ms. Blody consulted with physician assistant Ms. Callison on June 2, 2021. (Tr. 1419.) She complained of a "floaty feeling" and constant pressure in the back of her head. (*Id.*)

14

Ms. Blody consulted with Dr. Kapler on July 23, 2021. (Tr. 1416.) She complained of constant pressure in her head and muscle spasms that "come out of nowhere." (*Id.*) Dr. Kapler planned for her to undergo an electroencephalogram to assess the muscle spasms. (Tr. 1417.) Ms. Blody underwent the test, and the results were normal. (Tr. 1414–15.)

Ms. Blody underwent a psychological evaluation with Dr. Thomas Evans on August 23, 2021. (Tr. 985–89.) She described that she was able to drive. (Tr. 986.) Her husband helps her with cooking, cleaning, and laundry, and they usually pick-up groceries "curbside." (*Id.*) She wakes up at 7:00 a.m., will perform some household chores and rest throughout the day, and goes to bed at 11:30 p.m. (*Id.*) Dr. Evans noted that Ms. Blody walked with a cane but "was not observed to be in any physical distress once seated." (Tr. 987.) Dr. Evans opined that Ms. Blody met the criteria for unspecified depressive disorder and unspecified anxiety disorder based on her reported history, but he noted that "[n]o signs" of depression or anxiety were observed during the evaluation. (Tr. 988.) Dr. Evans opined that Ms. Blody should not have any difficulties understanding and carrying out simple to moderately complex instructions in a workplace setting, did not show any restlessness or inability to maintain focus, and reported being able to get along with coworkers and bosses. (Tr. 988.)

On the same day, Ms. Blody consulted with Ms. Callison, complaining of body aches, joint pain, and head pressure. (Tr. 1411.)

Ms. Blody consulted with physician assistant Deborah Sommers on September 14, 2021, complaining that she gets dizzy in the shower; she described that in the shower her "heart rate goes up and oxygen level goes down." (Tr. 1443.)

At a counseling appointment on September 16, 2021, Ms. Blody reported being diagnosed with fibromyalgia and expressed hope that surgery to install a shunt could relieve "many of her physical symptoms that have kept her from working." (Tr. 1203–04.)

On September 23, 2021, Ms. Blody consulted with physician assistant Susan Jakubek at the Burkhardt Brain Tumor Center. (Tr. 1114.) Ms. Blody complained of "spotty vision," shoulder and neck pain, and "head pressure." (*Id.*) Ms. Jakubek recommended a repeat MRI scan to look for signs of intracranial pressure, as well as a repeated lumbar puncture to measure her current opening pressure. (*Id.*)

An MRI scan on October 2021 revealed a "partially empty sella, a normal variant." (Tr. 1107.) There was "[m]inimal nonspecific white matter change" but "[n]o significant volume loss for age." (Tr. 1107–08.) The radiologist concluded that the MRI reflected no acute issues and only "[m]inimal chronic change." (Tr. 1108.) A repeat lumbar puncture revealed an opening pressure of 23 cmH20. (Tr. 1117.)

On November 5, 2021, Ms. Blody consulted with Ms. Jakubek in a virtual appointment regarding her intracranial hypertension. (Tr. 1096.) Ms. Jakubek noted that the opening pressure at the most recent lumbar puncture was lower than the opening pressure recorded at Ms. Blody's 2019 procedure (27 cmH20). (Tr. 1096.)

Ms. Blody consulted with Dr. Kapler on November 18, 2021. (Tr. 1408.) She reported continued headaches and pressure, which were worse with bending over or coughing. (*Id.*) Dr. Kapler planned to assess Ms. Blody's heart with a Holter monitor. (Tr. 1409.) Ms. Blody wore a Holter monitor for 48 hours, for the purpose of assessing reported heart palpitations. (Tr. 1032.) Her heart rhythm was "essentially normal," and each documented complaint of chest pain that Ms. Blody registered corresponded with a finding of normal sinus rhythm. (*Id.*)

16

On November 19, 2021, a vascular neurologist noted that imaging revealed possible bilateral venous stenosis. (Tr. 1077.) Ms. Blody was referred to an ophthalmologist for an assessment of papilledema, with the plan to consider venous stenting if she had that condition. (*Id.*)

Ms. Blody consulted with ophthalmologist Dr. Lisa Lystad on November 30, 2021. (Tr. 1053.) Ms. Blody complained of "brain fog" from intracranial pressure, daily headaches, tinnitus, and transient visual obscurations. (*Id.*) After a physical examination, Dr. Lystad concluded that "all indicators during this exam show that the intracranial pressure has returned to the normal range" and that Ms. Blody is not a candidate for a stent or shunt procedure. (*Id.*) Ms. Blody was continued on her headache medicine, as Ms. Blody had reported a decrease in headaches on the medicine. (*Id.*)

After confirmation that Ms. Blody did not have papilledema, her neurology team made certain medication changes and planned to continue monitoring for papilledema. (Tr. 1078.)

At a counseling appointment on December 1, 2021, Ms. Blody reported "positive news" that her eye doctor had told her "that her medication sems to be working"; Ms. Blody "expressed relief about this." (Tr. 1219.)

At counseling appointments on December 16, 2021, and January 5, 2022, Ms. Blody complained of increased headaches after the last medication change, along with feeling tired and experiencing "brain fog." (Tr. 1223, 1343–44.)

Dr. Ken Murray, Ms. Blody's counselor, completed a medical source statement on January 10, 2022, opining that Ms. Blody has major depressive disorder and could be expected to have marked limitations in her ability to sustain regular attendance at work and to manage her own

17

psychological symptoms. (Tr. 1261–62.) Dr. Murray identified numerous other moderate and mild mental functional limitations. (*Id.*)

Ms. Blody consulted with Dr. Kapler on January 11, 2022. (Tr. 1405.) She complained of continuing daily headaches and pressure. (*Id.*) Dr. Kapler planned to conduct electromyography and skin biopsies to check for large-fiber neuropathy and to assess epidermal nerve-fiber density. (Tr. 1406.)

On January 18, 2022, Ms. Blody consulted virtually with neurologist Dr. Ahmed Zubair regarding her headaches and face pain. (Tr. 1277.) Dr. Zubair summarized that Ms. Blody was experiencing two exertional migraine headache days per month, with associated symptoms of photophobia and phonophobia. (*Id.*) She was experiencing ten pressure-related headache days per month. (Tr. 1278.) Dr. Zubair independently reviewed Ms. Blody's most recent MRI images and concluded that the images are consistent with mild chronic microvascular ischemia or migraine. (Tr. 1282.) Dr. Zubair opined that Ms. Blody's neurological examination at this visit was "essentially normal"; he recommended treatment with a calcitonin-gene-related peptide (CGRP) monoclonal antibody, specifically erenumab. (*Id.*) Dr. Zubair also recommended that Ms. Blody engage in 20 to 30 minutes of mild aerobic exercise every day, as "[e]xercise is a critical part of headache prevention." (Tr. 1283.)

On the same day, Dr. Christopher Hassett performed "[e]xtensive" electromyography on Ms. Blody's lower extremities based on her report of weakness, numbness, and tingling. (Tr. 1400, 1403.) The results were all normal. (Tr. 1403–04.)

At a counseling appointment on January 25, 2022, Ms. Blody expressed anxiety that her disability-benefits application was denied, explaining that she felt she could not be gainfully employed because of her daily debilitating headaches. (Tr. 1347.)

At a counseling appointment on February 15, 2022, Ms. Blody reported that she continued to suffer from severe headaches. (Tr. 1352.) She presented to a counseling appointment on March 1, 2022, with a depressed mood, primarily related to severe sinus problems, headaches, and neuropathy in her legs. (Tr. 1377.)

Dr. Kapler performed a skin biopsy on March 2, 2022, for the purpose of checking Ms. Blody's nerve-fiber density. (Tr. 1398.)

Ms. Blody met virtually with Dr. Ahmed on March 9, 2022. (Tr. 1389.) Dr. Ahmed noted that Ms. Blody's insurance carrier had refused to cover monoclonal-antibody treatment and instead recommended treatment with amitriptyline. (Tr. 1389, 1391–92.) The medication change was made. (Tr. 1392.)

Ms. Blody consulted with Dr. Kapler on March 16, 2022. (Tr. 1395.) She reported that her headaches were unchanged from the last appointment, and she complained of worsening joint pain. (*Id.*) The skin biopsy results showed normal nerve-fiber density. (Tr. 1396.) Dr. Kapler signed a letter stating that Ms. Blody is unable to work due to active neurological and rheumatologic issues. (Tr. 1394.) Dr. Kapler referred her to a rheumatologist. (Tr. 1397.)

Ms. Blody consulted with rheumatologist Dr. Howard Smith on April 28, 2022. (Tr. 1553–54.) Dr. Smith concluded that Ms. Blody met the diagnostic criteria for fibromyalgia and opined that Ms. Blody's "diffuse, widespread pain" and other conditions were "entirely consistent" with that ailment. (Tr. 1553.) Dr. Smith assessed that Ms. Blody was "stable"; ordered blood tests; and recommended that Ms. Blody exercise, get enough sleep, and obtain treatment for depression. (Tr. 1553–54.) Ms. Blody submitted photographs of her hands and feet. (*See* Tr. 735–42.) The scanned photographs in the record appear to be poor copies, but Ms. Blody wrote that they

document Raynaud's phenomenon. (*See* Tr. 735.) Dr. Smith seems to have concurred. (*See* Tr. 1553.)

Ms. Blody consulted with Dr. Kapler on June 7, 2022. (Tr. 1561.) She said her headaches had gotten worse and her intracranial hypertension symptoms were unchanged. (*Id.*) Dr. Kapler gave her a sample of a new migraine medication. (Tr. 1562.)

Ms. Blody consulted with Dr. Pavan Tankha on June 23, 2022, complaining of pain in her back, neck, joints, and legs. (Tr. 1564.) Dr. Tankha started Ms. Blody on a new nighttime medication. (Tr. 1567.)

Ms. Blody was continued on her current medication at an appointment with Ms. Sommers on June 24, 2022. (Tr. 1936–38.)

Ms. Blody consulted with Dr. Brendan Bauer on September 1, 2022. (Tr. 1692.) She complained of constant pain, which she rated at a seven. (*Id.*)

Ms. Blody consulted with Dr. Tankha again on September 13, 2022. (Tr. 1585.) Ms. Blody reported that her pain was unchanged; she continued to have persistent achy pain all day. (*Id.*) Dr. Tankha made medication changes. (Tr. 1587.)

On September 15, 2022, Ms. Blody consulted with Dr. Bauer, complaining of numbness and tingling in her hands that caused her to drop objects. (Tr. 1589.) A nerve-conduction study was largely normal, although focal-conduction abnormalities were noted at the wrists consistent with mild bilateral carpal tunnel syndrome. (Tr. 1592–93.)

On September 29, 2022, Ms. Blody again consulted with Dr. Bauer, complaining of burning, numbness, and tingling in her legs and feet. (Tr. 1617.) A nerve-conduction study revealed findings consistent with moderate bilateral radiculopathies related to the S1 nerve. (Tr. 1620.) There was no evidence of myopathy or a sensory or motor neuropathy. (*Id.*)

On the same day, Ms. Blody underwent a "brain map" study with Dr. Bauer. (Tr. 1622.) The test revealed "[s]lowed response time to visual and cognitive stimulus" and a reaction time that was "more delayed than expected." (*Id.*; *see also* Tr. 1654–90.) Dr. Bauer noted findings associated with cognition, information processing, and working memory, and findings correlated with depression. (*Id.*)

Ms. Blody underwent an MRI of the lumbar spine on October 7, 2022. (Tr. 1635.) The scan revealed "[m]ild disc desiccation and intervertebral disc height loss" at the L3 to L4 vertebrae. (*Id.*) There was a minimal disc bulge at the L3 to L4 vertebrae. (Tr. 1636.) There was a small disc bulge at the L4 to L5 vertebrae, with "[m]ild facet arthropathy." (*Id.*) There was mild facet arthropathy observed at the L5 to S1 vertebrae. (*Id.*)

Ms. Blody met with Dr. Bauer on October 21, 2022, to discuss the results of the brain mapping. (Tr. 1648.) Ms. Blody complained of daily headaches and other pain and symptoms. (*Id.*) Dr. Bauer gave her a sample of another migraine medicine. (*Id.*)

Ms. Blody received a migraine-medicine injection on November 7, 2022. (Tr. 1646.)

Ms. Blody went to the emergency room on December 3, 2022, complaining of "generalized all over pain." (Tr. 1903.) Ms. Blody was given a short-term prescription of pain medication to use until she would be able to consult with pain-management professionals. (Tr. 1904.)

Ms. Blody consulted with Dr. Joshua Goldner for pain-management services on December 6, 2022. (Tr. 1906.) Ms. Blody complained of pain rated at a six out of ten that "affects all aspects" of her life. (*Id.*) She complained of "foggy brain," too. (*Id.*) Dr. Goldner's notes identify migraine headaches as a "resolved" condition. (Tr. 1908.) Dr. Goldner reviewed MRI images of the lumbar spine from October 2022, concluding that they were "essentially normal" with "[v]ery mild degenerative disc disease" at the L3 to L4 vertebrae. (Tr. 1910.) Dr. Goldner explained to Ms.

Blody that, because her reported pain was not responsive to "extensive and appropriate medication management," the next treatment that may be beneficial would be cognitive behavioral therapy. (*Id.*) He advised that opioid medication is not indicated to treat fibromyalgia pain. (*Id.*) Ms. Blody requested a second opinion. (*Id.*)

Ms. Blody consulted with Dr. Sarel Vorster on December 9, 2022. (Tr. 1763.) Ms. Blody requested a stent, with the hope to reduce her medications, and despite advice that the procedure would be challenging because of the nature of the relevant ventricles. (*Id.*)

Ms. Blody met with a nurse to receive a migraine-medicine injection on January 5, 2023. (Tr. 1764.) Ms. Blody noted that her migraines had lessened to two per week, and a new medication (Nurtec) was able to abort the migraines. (*Id.*) She complained of continued head pressure. (Tr. 1765.) Ms. Blody underwent a longer electroencephalogram to check for seizure or epileptiform activity, and the test was normal. (Tr. 1819.)

On February 11, 2023, Ms. Blody again went to the emergency room, complaining of "chronic pain throughout body." (Tr. 1911.) She described "generalized muscular pain" that was "achy" in character. (*Id.*) Ms. Blody was given pain medication and prescribed a "short-term course for home"; she was advised to follow up with her pain-management team and was told that she would not be given further pain medication in the emergency department for a time. (Tr. 1912.)

On March 22, 2023, Ms. Blody complained that she was seeing "spots of colors" when she blinks. (Tr. 1826.) She complained of continued head pressure and flu-like symptoms. (*Id.*) The nurse practitioner whom she saw, Jacqueline Graziani, wrote a letter on the same date stating that Ms. Blody is unable to work "[d]ue to neurological disease." (Tr. 1830.)

Ms. Blody followed up with Ms. Graziani on April 27, 2023. (Tr. 1843.) Ms. Blody complained of continued daily pressure headaches. (*Id.*)

Ms. Blody presented to the emergency room again on April 29, 2023, complaining of abdominal pain, dizziness, and nausea. (Tr. 1915.) She said she had been having the pain for one month, but that it became worse on this day. (*Id.*) A CT scan of Ms. Blody's abdomen and pelvis revealed no significant change from an October 2022 scan. (Tr. 1914.) There were no positive findings on her lab work, either. (Tr. 1917.) Ms. Blody was given morphine and discharged home with instructions to monitor and follow up with a gastroenterologist. (Tr. 1917–18.)

Ms. Blody followed up with Ms. Sommers on May 11, 2023, complaining of abdominal pain near her ribs since her visit to the emergency room. (Tr. 1933.) Ms. Sommers ordered a hepatobiliary iminodiacetic acid (HIDA) scan. (Tr. 1935.)

Ms. Blody underwent a rheumatological evaluation with Dr. Abreesh Chawla on May 19, 2023. (Tr. 1861.) Dr. Chawla noted that the majority of the lab testing was unremarkable; he explained that the medications Ms. Blody was taking were associated with "drug induced raynaud's." (Tr. 1863.) He recommended aerobic exercise, therapy, and weight loss to treat Ms. Blody's fibromyalgia, and he placed a consultation to integrative-medicine professionals. (*Id.*; *see also* Tr. 1946.)

Ms. Blody consulted with Ms. Graziani on June 14, 2023. (Tr. 1868.) She complained of continued daily headaches, constant pressure, and pain. (*Id.*) She was having migraines twice a week. (*Id.*) Ms. Graziani made medication changes. (Tr. 1871.)

Ms. Blody appears to have presented to the emergency room on August 12, 2023, complaining of a cervical strain and head injury from a fall from a bicycle. (*See* Tr. 1982, 1985.) The record seemingly does not include a full set of medical records from this visit, but a CT scan of the brain conducted on that date was normal except for an unchanged partially empty sella ("a

nonspecific finding that is unchanged from prior examination"). (Tr. 1983.) She was given morphine for the reported head pain from "hit[ting] her head hard." (*See* Tr. 1985.)

Ms. Blody received a Botox injection on August 16, 2023, for the purpose of treating her headaches. (Tr. 1985, 1989.) Ms. Sommers indicated that Ms. Blody's symptoms were consistent with a mild concussion from the fall. (Tr. 1989.)

## IV.    DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ determined that Ms. Blody had not engaged in substantial gainful activity since January 7, 2021. (Tr. 225.)

The ALJ further determined that Ms. Blody has the following severe impairments: (1) migraines and (2) idiopathic intracranial hypertension. (*Id.*)

The ALJ found that Ms. Blody also had non-severe physical impairments, those being: fibromyalgia, depressive disorder, generalized anxiety disorder, pseudotumor, irritable bowel syndrome, visual disorder, gastroesophageal reflux disease, chronic sinusitis, Reynaud's syndrome, cervical spine degenerative disc disease, lumbar spine degenerative disc disease at the L3–S1 vertebrae, mild bilateral carpal tunnel syndrome, papilledema, obstructive sleep apnea, chronic obstructive pulmonary disease, and obesity. (Tr. 226–27.) The ALJ noted that he considered all of Ms. Blody's impairments—both severe and nonsevere—when crafting the residual functional capacity. (Tr. 228.)

The ALJ next found that Ms. Blody does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 231.)

The ALJ determined that Ms. Blody had the residual functional capacity to perform sedentary work, except that (1) she can frequently climb ramps and stairs but can never climb

24

ladders, ropes, or scaffolds; (2) she must avoid "moving mechanical parts and high exposed places"; (3) she can understand, remember, and carry out simple or detailed instructions for work, as long as those instructions are not complex; (4) she cannot perform work requiring a specific production rate (like assembly line work) or hourly quotas; (5) she is capable of using judgment to make simple work-related decisions; (6) she can handle occasional changes in a routine work setting; and (7) she can occasionally interact with the public, co-workers, and supervisors. (Tr. 232.)

The ALJ next determined that Ms. Blody was unable to perform her past relevant work as a home attendant, relying on the vocation expert's testimony that an individual with Ms. Blody's RFC could not perform the work required by that position. (Tr. 238–39.)

However, the ALJ determined that—considering Ms. Blody's age, education, work experience, and residual functional capacity—there are jobs that exist in significant numbers in the national economy that she could perform, including work as a "touch-up screener" (DOT 726.684-110), "assembler" (DOT 739.687-066), or "inspector" (DOT 669.687-014).[3] (Tr. 239–40.)

Accordingly, the ALJ determined that Ms. Blody was not disabled. (Tr. 241.)

## V.     LAW AND ANALYSIS

### A.     Standard of Review

Whether reviewing a decision to deny SSI benefits (undertaking the review authorized by 42 U.S.C. § 1383(c)(3)) or a decision to deny disability insurance benefits (reviewing under 42

---

[3] These jobs refer to entries in the U.S. Department of Labor's *Dictionary of Occupational Titles*. The DOL no longer publishes the tool—*see Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014)—but the most recent version, from 1991, is available online through the DOL's Office of Administrative Law Judges Law Library. *Dictionary of Occupational Titles—Fourth Edition, Revised 1991*, U.S. DEPT. OF LABOR OFF. OF ADMIN. L. JUDGES, https://www.dol.gov/agencies/oalj/topics/libraries/LIBDOT.

U.S.C. § 405(g)), the Court uses the same standard of review. *See* 42 U.S.C. § 1383(c)(3) (final determinations under 42 U.S.C. § 1383 "shall be subject to judicial review as provided in [§] 405(g) . . . to the same extent as . . . final determinations under [§] 405 . . . .").

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983).

In addition to considering whether the Commission's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA failed to

follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B.     Standard for Disability

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform work in the national economy. *Id.*

C.    Analysis

Ms. Blody contends that the ALJ erred at Step Five when crafting the RFC, arguing that substantial evidence does not support the ALJ's conclusion that Ms. Blody's description of the intensity, persistence, and limiting effects of her migraine symptoms was not consistent with the medical evidence. (Pl.'s Merits Br., ECF No. 8, PageID# 2028.)

An individual's residual functional capacity (*i.e.*, the most an individual can still do despite applicable limitations) is an administrative decision reserved for the ALJ. 20 C.F.R. § 1546(c). The ALJ assesses an individual's RFC based on all relevant evidence of record. 20 C.F.R. § 404.1545(a)(1). It is well-established that an ALJ need not discuss each piece of evidence or limitation considered. *See, e.g.*, *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r of Sec.*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004)) (finding an ALJ need not discuss every piece of evidence in the record). But courts do not hesitate to remand where an ALJ selectively considers only portions of the medical evidence that place that claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See, e.g.*, *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *see also* *Ackles v. Colvin*, No. 3:14CV00249, 2015 WL 1757474, at *6 (S.D. Ohio Apr. 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

28

Here, Ms. Blody contends that the ALJ exceeded his role by "playing doctor," misconstruing the record to unfairly minimize the limiting effect of her migraines. (Pl.'s Merit Br., ECF No. 8, PageID# 2030.) She reads the medical evidence to thoroughly document a history of consistent migraine headaches occurring at least once a week, severe enough to keep her in bed for a full day. (*Id.* at PageID# 2032.) She argues that the ALJ failed to consider that Ms. Blody would be consistently absent from work due to these migraines. (*Id.* at PageID# 2032–33.) She further points out that the debilitating migraines have persisted despite a history of medication changes, and she argues that the multiple medications she needs to stop the migraines have themselves caused "medication overuse headaches." (*Id.* at 2033–34.)

When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process for evaluating these symptoms. *See Moore v. Comm'r of Soc. Sec.*, 573 Fed. App'x 540, 542 (6th Cir. Aug. 5, 2014); *Massey v. Comm'r of Soc. Sec.*, 2011 WL 383254 at * 3 (6th Cir. Feb. 7, 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p, 2016 WL 1119029 (March 16, 2016).

In evaluating a claimant's symptoms at the second step of the analysis, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. Beyond medical evidence, there are seven factors that the ALJ should consider. These factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any

medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029 at * 7.[4]

The ALJ is not required to discuss each of these factors or even all the evidence in the record but need only acknowledge the factors and discuss the evidence that supports their decision. *See Bryson v. Comm'r of Soc. Sec.*, 2021 WL 2735993 at * 14 (N.D. Ohio June 10, 2021), *adopted by*, 2021 WL 2720071 (N.D. Ohio July 1, 2021). However, "[i]n evaluating an individual's symptoms, it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'" SSR 16-3p, 2016 WL 1119029 at * 9. Rather, an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.*; *see also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994)

---

[4] The Social Security Administration ("SSA") previously characterized the evaluation of a claimant's subjective symptom complaints as a "credibility" determination. *See* SSR 96-7p, 1996 SSR LEXIS 4 (July 2, 1996). In March 2016, however, the SSA issued SSR 16-3p. Therein, the SSA explained that this characterization did not accurately reflect the language in the regulations and eliminated the term "credibility" from its sub-regulatory policy. *See* SSR 16-3p, 2016 WL 1119029 (Oct. 25, 2017). The SSA explained that "subjective symptom evaluation is not an examination of an individual's character," but is instead an examination of the subjective complaints' consistency with other evidence in the record. SSR 16-3p, 2016 WL 1119029. Despite these changes in terminology, courts have concluded that SSR 16-3p did not substantially change existing law on this issue. *See Banks v. Comm'r of Soc. Sec.*, 2018 WL 6060449 at *5 (S.D. Ohio Nov. 20, 2018) (quoting language in SSR 16-3p that states intention to "clarify" and not to substantially "change" existing SSR 96-7p), *adopted at* 2019 WL 187914 (S.D. Ohio Jan. 14, 2019).

("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so.").

An ALJ is not required to accept the claimant's complaints at face value but may discount them based on his consideration of the above factors. *See Dooley v. Comm'r of Soc. Sec.*, 656 Fed. App'x 113, 119 (6th Cir. 2016); *Bryson*, 2021 WL 2735993 at *15. In light of the ALJ's opportunity to observe the claimant's demeanor, the ALJ's evaluation of a claimant's subjective symptoms is entitled to considerable deference and should not be discarded lightly. *See Dooley*, 656 Fed. App'x at 119 ("[A]n ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'") (quoting *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Jidas v. Comm'r of Soc. Sec.*, 2019 WL 2252289 at *8–9 (E.D. Mich. Feb. 26, 2019), *adopted by*, 2019 WL 1306172 (E.D. Mich. March 22, 2019). Indeed, a reviewing court should not disturb an ALJ's credibility determination "absent [a] compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001); *see also Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 788 (6th Cir. 2017) (noting that "while an ALJ's credibility determinations must be supported by substantial evidence, we accord them special deference"); *Hernandez v. Comm'r of Soc. Sec.*, 644 Fed. App'x 468, 476 (6th Cir. 2016) (noting that, "in practice ALJ credibility findings have become essentially 'unchallengeable.' "); *Riebe v. Comm'r of Soc. Sec.*, 2019 WL 4600628 at * 7–8 (N.D. Ohio Sept. 23, 2019) (same).

The Commissioner defends the ALJ's decision as a thorough summary of the objective evidence and Ms. Blody's statements about her conditions. (Def.'s Merit Br., ECF No. 10, PageID# 2045.) The Commissioner argues that the RFC was supported by sufficient evidence, pointing out that it was consistent with the findings of the state agency reviewing physicians. (*Id.*)

The Commissioner further contends that the ALJ adequately set forth his consideration of the effectiveness of Ms. Blody's medical treatment and reasonably relied on medical imaging revealing relatively benign findings and normal medical examinations in concluding that Ms. Blody's statements about her migraines were not fully consistent with the medical evidence. (*Id.* at PageID# 2044–45.)

After a careful review, the Court finds that the ALJ complied with agency regulations in evaluating Ms. Blody's subjective statements about the symptoms and limiting effect of her conditions and that substantial evidence supports the ALJ's determination of Ms. Blody's RFC. The ALJ carefully considered Ms. Blody's reported symptoms, her hearing testimony, and the years of medical records in evidence.

The standard for "substantial evidence" is "not high." *Biestek*, 139 S.Ct. at 1154. "The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

Here, the ALJ did not "cherry-pick" evidence to support a finding that Ms. Blody was not disabled. To the contrary, the ALJ carefully and accurately summarized the medical records in evidence (Tr. 233–38) and correctly concluded that Ms. Blody's reported symptoms were partially,

but not fully, consistent with the record evidence. (Tr. 236.) In doing so, the ALJ accurately and comprehensively summarized Ms. Blody's testimony about her reported symptoms. (Tr. 232.) The ALJ acknowledged the numerous medication changes that several medical professionals across several specialties made to try to address Ms. Blody's reported headaches. (*See* Tr. 233–38.) He acknowledged the 2019 lumbar puncture with an opening pressure of 27 cmH20. (Tr. 233.) He acknowledged other abnormal findings, including hyperactive reflexes in June 2022 and several appointments where Ms. Blody had decreased memory or sensation. (*See, e.g.*, Tr. 237.) He listed Ms. Blody's complaints to medical professionals over the years about the consistent, severe nature of her migraines and headaches. (Tr. 233–38.) He acknowledged consideration of letters submitted by Ms. Blody's husband and treating professionals that stated the opinion that she could not work. (*See, e.g.*, Tr. 237–38.)

After acknowledging this evidence, the ALJ concluded that Ms. Blody's medical determinable impairments could reasonably be expected to cause some of her alleged symptoms. (Tr. 236.)

The ALJ then thoroughly explained—in light of the SSR 16-3p factors—why Ms. Blody's reported functional limitations were only partially consistent with the medical evidence. For instance, the ALJ noted that Ms. Blody was able to successfully participate in and satisfactorily complete physical therapy in 2021, despite her headache conditions and intracranial hypertension. (Tr. 233.) He noted that physical examinations at appointments where Ms. Blody was complaining of head pressure and pain were largely normal. (*See* Tr. 233–38.) The ALJ noted normal medical tests, like the June 2021 and January 2023 electroencephalograms, the Holter monitor, nerve-fiber testing, and other examinations. (Tr. 233–38.) The ALJ correctly identified that a repeat lumbar puncture revealed a lower opening pressure (23 cm H20) and an ophthalmologist confirmed that

Ms. Blody did not have papilledema, concluding that her intracranial pressure had normalized. (Tr. 234.) The ALJ described that brain imaging revealed largely normal brain structures, noting an exception for Ms. Blody's partially empty sella but correctly stating that the sella did not change over time. (*See* Tr. 235–36.) The ALJ noted that Ms. Blody was never hospitalized for migraine headaches. (Tr. 236.) The ALJ pointed out that on January 5, 2023, Ms. Blody noted that her migraines had lessened to two per week and said that a new medication (Nurtec) was able to abort the migraines. (Tr. 1764.)

The ALJ further did not defer completely to the opinions of the state agency consultants. Instead, the ALJ found the opinions only "somewhat persuasive," in that they were "generally supported by the evidence in the file at the time of their review" but were "not entirely consistent with a complete review of the medical records in this case." (Tr. 237.)

After engaging in this review, the ALJ concluded that Ms. Blody's migraines and intracranial hypertension were adequately addressed in the RFC, which limited her to "work at the sedentary exertional level, with only frequent climbing ramps and stairs." (Tr. 238.) The ALJ noted that he further limited Ms. Blody to positions that would require only occasional interaction with co-workers, supervisors, and the public. (*Id.*)

Ms. Blody argued that the ALJ failed to acknowledge the "lengthy timeline, showing complaints of severe headaches with frequent, appropriate, [and] aggressive treatment." (Pl.'s Merit Br., ECF No. 8, PageID# 2030.) To the contrary, the ALJ comprehensively summarized the medical evidence. (Tr. 233–38.) He acknowledged numerous medication changes, including identifying prescriptions by name and stating how the medications affected Ms. Blody's reported symptoms. (*Id.*) The ALJ fairly acknowledged that Ms. Blody "has consistently reported migraine headaches." (Tr. 236.)

Ms. Blody also pointed out that brain imaging revealed chronic microvascular ischemia or migraine. (*Id.* at PageID# 2031.) But the ALJ acknowledged that MRI imaging revealed "minimal chronic change" (Tr. 236), a summary of the evidence that is reasonable considering that Dr. Zubair himself characterized the changes as "mild" and where CT imaging in 2023 revealed normal, age-appropriate brain anatomy. (*See* Tr. 1983; *see also* Tr. 1108 ("[m]inimal chronic change").

All this is to say that the ALJ's decision addresses Ms. Blody's subjective complaints and explains why those complaints are not entirely consistent with the record. *See Pifer v. Comm'r of Soc. Sec.*, Case No. 1:21-CV-00314-CEH, 2022 WL 1521911 (N.D. Ohio May 13, 2022) (affirming where the ALJ considered the claimant's subjective allegations and gave a thorough explanation as to why he found those allegations inconsistent with the medical evidence).

The Court is convinced that the ALJ considered all the relevant evidence and that a reasonable mind might accept the record evidence as adequate to support the ALJ's findings. The RFC is consistent with the opinions of the state agency consultants. Moreover, the Court notes that Ms. Blody reported in January 2023 that her migraines had lessened to two per week and that Nurtec was able to abort the migraines. Thereafter, Ms. Blody sought medical treatment largely for non-migraine conditions, including for achy fibromyalgia pain, head pressure, and abdominal pain. Ms. Blody's reported migraine frequency—twice per week—was unchanged in June 2023. As late as May 2023, Dr. Chawla recommended aerobic exercise for Ms. Blody, and she had been riding a bicycle in August 2023 when she fell and sought treatment for a cervical strain and head injury.

To the extent Ms. Blody believes the ALJ should have weighed the evidence differently and imposed greater limitations, it is not a reviewing court's role to second guess the ALJ's

determination. *See Jones*, 336 F.3d at 477. The Court is convinced that there is no compelling reason for the Court to disturb the ALJ's findings. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732 (N.D. Ohio 2005).

Accordingly, Ms. Blody's assignment of error is overruled.

## VI.    CONCLUSION

Based on the foregoing, the Court AFFIRMS the Commissioner's decision denying Ms. Blody's application for benefits.


**IT IS SO ORDERED.**


Dated:  February 25, 2025                                    */s Jennifer Dowdell Armstrong*
                                                              JENNIFER DOWDELL ARMSTRONG
                                                              UNITED STATES MAGISTRATE JUDGE